## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 14 2019, 8:59 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jerry T. Drook
Marion, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Benjamin Shoptaw
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of A.B. (Minor Child); | February 14, 2019 |
| D.F. (Father), | Court of Appeals Case No. 18A-JT-2124 |
| *Appellant-Respondent,* | Appeal from the Grant Superior Court |
| v. | The Honorable Dana J. Kenworthy, Judge |
| Indiana Department of Child Services, | Trial Court Cause No. 27D02-1710-JT-34 |
| *Appellee-Petitioner.* | |

**Najam, Judge.**

## Statement of the Case

D.F. ("Father") appeals the trial court's termination of his parental rights over his minor child A.B. ("Child"). Father presents a single issue for our review, namely, whether the Indiana Department of Child Services ("DCS") presented sufficient evidence to support the termination of his parental rights. We affirm.

## Facts and Procedural History

S.B. ("Mother") and Father are the biological parents of Child, born on January 4, 2011.[1] On May 1, 2015, DCS became aware of allegations that Mother was homeless and had untreated mental illness and substance abuse issues. DCS also learned "of domestic violence between Mother and her boyfriend" and that Mother was neglecting Child's needs. Appellant's App. Vol. II at 122. DCS removed Child from Mother's care and placed her in foster care. Mother identified Father as Child's father, but paternity had not been established. In any event, Father was incarcerated.

On May 6, DCS filed a petition alleging that Child was a child in need of services ("CHINS"). On September 16, the trial court found Child to be a CHINS. Almost two years later, on August 23, 2017, after Father had failed to comply with the court's order to participate in services at the Department of

---

[1] Mother and Father were never married, and Father has not petitioned to establish his paternity of A.B. But a DNA test obtained by DCS shows that Father is A.B.'s biological father. Mother has consented to Child's adoption and does not participate in this appeal.

Correction ("DOC"), DCS filed a petition to terminate Father's parental rights over Child.

[4] Following a hearing, the trial court granted the petition on August 9, 2018. In support of its order, the trial court entered the following findings and conclusions:

> 7. On or about May 1, 2015, DCS became involved with [Child] and Mother when DCS investigated a report that [Child] was being neglected in [Child]'s home. Specifically, Mother was homeless, had mental health issues, had overdosed, and could not properly care for [Child]. There was also an allegation of domestic violence between Mother and her boyfriend.
>
> 8. [Child] was removed from Mother's care on May 1, 2015, and placed into foster care.
>
> 9. Paternity for [Child] had not been established at the time of removal, but Mother identified [Father] as [Child]'s father.
>
> 10. On May 6, 2015, DCS filed [a] Verified Petition Alleging [Child] was a Child in Need of Services ("CHINS") in Cause 27D02-1505-JC-49 ("CHINS proceeding").
>
> 11. On August 6, 2015, the Court in the CHINS proceeding held a continued initial hearing. Father appeared via video from the New Castle Correctional Facility. Father requested and was appointed counsel.
>
> 12. Father remained incarcerated throughout the CHINS proceeding.
>
> 13. Father appeared via telephone or by video connection from the DOC, and by counsel, at hearings throughout the CHINS proceedings.

14. On September 16, 2015, the Court in the CHINS proceeding entered [an] Order finding [Child] to be a CHINS.

15. On September 24, 2015, the Court in the CHINS proceeding held [a] dispositional hearing. The Court ordered that [Child] remain outside her parents' care, and [it] continued wardship with DCS. The Court ordered Father to participate in services at the Department of Correction[] ("DOC") which could assist him in reunifying with [Child], and to notify DCS upon his release from the DOC.

16. The Court issued [a] Dispositional Order in the CHINS proceeding on September 29, 2015.

17. On October 1, 2015, [Child] was placed into the care of Foster Mother [W.S.], and [she] has remained in her care continuously since that time. Foster Mother wishes to adopt [Child].

18. Foster Mother has also had two (2) of [Child]'s siblings in her care throughout the term of [Child]'s placement with her. Foster Mother also intends to adopt [Child]'s siblings, and Mother has consented to their adoption.

19. Father is not the biological father of [Child]'s siblings.

20. [Child] is very bonded with Foster Mother and her siblings, and they are a well-functioning family unit.

21. On January 26, 2017, the Court in the CHINS proceeding changed the permanency plan from reunification to initiation of termination of parental rights proceedings and adoption.

22. Father entered the Delaware County Jail on or about June 11, 2010, approximately six (6) months prior to [Child]'s birth. Father found out about Mother's pregnancy a few days prior to

his arrest. Father's arrest occurred on the same day as his criminal offenses, and he was aware of Mother's pregnancy at that time.

23. On January 19, 2011, Father entered a plea of guilty to the criminal charges in Delaware County, Indiana in Cause 18C05-1006-FB-14, including two (2) counts of Sexual Misconduct with a Minor, Class B Felonies, and Contributing to the Delinquency of a Minor, [a] Class A Misdemeanor. During his guilty plea and factual basis, Father admitted under oath that he knew the victim was fifteen (15) years of age, that he was thirty-one (31) years of age, that he gave the victim vodka to drink and had vaginal, oral and anal sex with the victim.

24. On April 26, 2011, in Cause 18C05-1006-FB-14 the Court sentenced Father to twelve (12) years, with ten (10) years executed and two (2) years suspended on each of the Class B Felonies, and one (1) year suspended on the Class A misdemeanor. The Court ordered the sentences to be served consecutively.

25. On February 17, 2012, in Cause 18C05-1006-FB-14, the Court issued a Nunc Pro Tunc Order correcting its April 26, 2011 entry, adding "the defendant is found to be a sexually violent predator pursuant to Ind. Code §35-38-1-7.5(a)." The Court made this finding after ordering psychological and psychiatric evaluations of Father. Dr. Frank Krause submitted the psychological report to the Court, and Dr. Craig Buckles submitted the psychiatric evaluation.

26. On August 17, 2012, Father filed a Petition for Post-Conviction Relief in Cause 18C05-1006-FB-14. On July 15, 2016, the Court denied Father's Petition.

27. Father filed and currently has pending a civil case in Henry County, Indiana under Cause 33C02-1506-PL-49 related to the Delaware County case. This case has been pending for three

(3) years, and has not advanced beyond the pretrial stage. Father claims that this case will result in his complete release from his criminal convictions. The CCS does not support this claim.

28. Father's earliest possible release date from the DOC is June 11, 2020—more than two years after the fact-finding in this case. After release from incarceration, Father will be on probation for five (5) years. Father also acknowledges that he will be required to register as a sex offender after release from incarceration.

29. Father admitted that he met Mother while she was in high school, and they lived together in Muncie, Indiana. Mother's date of birth is September 20, 1991.

30. Father has received Social Security Disability since he was a child. He indicates this is for post-traumatic stress disorder, anxiety, and a learning disability. Father continued to receive disability payments until after his conviction on April 26, 2011. Father states payments were between $600 and $700 per month.

31. Father graduated from high school with a special education diploma.

32. Father worked at odd jobs as an adult, i.e., "junking," painting and construction, until his incarceration in Delaware County in 2010.

33. Father's only employment during incarceration was in a brake shop, earning $150 per month. However, Father indicates he could not continue this employment due his hands "locking up."

34. During his incarceration at DOC since 2010, Father has completed no programs—either programs designed to enhance his ability to parent or provide support for [Child], or otherwise.

Although Father claims that no services have been available to him, the Court does not find this testimony to be credible.

35. Father was enrolled in Thinking for a Change at DOC, but was removed from that program "for what he calls a 'misunderstanding or mistake.'"

36. Father testified that he applied to the PLUS program at DOC, but had not been accepted as of the date of the fact-finding hearing in this case.

37. During his eight (8) years of incarceration, Father has not enrolled in or completed any sex offender counseling or treatment.

38. Father claims that he only pled guilty to the crimes in Cause 18C05-1006-FB-14 due to "extenuating circumstances" and lied under oath to establish the factual basis for his crimes. The Court does not find this testimony credible. In fact, the Court finds Defendant's minimization of his responsibility for the crimes for which [he] has been convicted especially troubling.

39. Father claims he provided funds for [Child] from his disability payments, and that he tried to start child support payments. No other evidence corroborates these claims, and the Court does not find Father's testimony credible.

40. Father has never met [Child], and [he] does not have a relationship with her. [Child] was four (4) years and four (4) months of age at the time the CHINS proceeding began. Father had never filed a court case to pursue paternity or visitation with [Child] before the onset of the CHINS proceeding.

41. During the CHINS proceeding, Father likewise did not file an action to establish paternity of [Child]. DNA results received in the CHINS proceeding on February 2, 2016 indicate that Father

is [Child]'s biological father, but he still has not taken steps to establish legal paternity. [Child] is now seven (7) years of age.

42. Father indicates that he tried but was unable to file for paternity. The Court does not find this testimony credible. The Court notes Father's wealth of correspondence to the Court in the CHINS and termination of parental rights proceedings, his filing of a post-conviction relief petition, and his filing of a civil lawsuit—all while incarcerated—as evidence of his knowledge of and ability to file legal documents pro se. Father acknowledges that he never initiated a paternity action.

43. Father requested visits with [Child] during the CHINS proceeding on September 15, 2015, but the Court denied visits due to [the] lack of DNA testing or established paternity, as well as the lack of [a] relationship between Father and [Child]. The Court continued denial of visits at the April 16, 2016 permanency hearing until such time as [Child]'s treatment team provided recommendations to the Court regarding visits. At [the] November 10, 2016, periodic case review, the Court ordered [Child] to participate in counseling, and that the therapist provide written recommendations regarding contact between Father and [Child]. The Court further ordered that Father have the ability to send letters for [Child] to FCM Brubaker, who would then forward the letters to [Child]'s therapist. Again at the January 26, 2017, permanency hearing, the Court ordered that Father have the ability to send letters for [Child] to FCM Brubaker, who would forward them to [Child]'s therapist. [Child]'s therapist never recommended contact with Father.

44. Father sent only one letter for [Child] to FCM Brubaker throughout the three-year CHINS proceeding.

45. Father has never provided financial support for [Child]. Father has been incarcerated throughout [Child]'s life, and [he] will remain incarcerated for the next two (2) years.

46. Father made only one attempt to contact DCS, outside his contacts during court hearings. This one contact was to send a letter to DCS one to two weeks prior to the termination case filing, to inform DCS that he had a lawsuit against DCS, other officials, and the State in Delaware County. Father admitted that he received an acknowledgement from DCS that they received his letter.

47. Father requested that his sister [T.S.] be given the care of [Child] until he is released from the DOC. He does not want [T.S.] to adopt [Child], because he wants custody upon his release.

48. Father gave CASA Crystal Foreman phone numbers for [T.S.] in November 2016. CASA used these numbers to try to make contact with [T.S.] in November 2016. One number was disconnected. CASA left a message at the second number, but did not receive a response. CASA further found "[T.M.]" who[m] she believed to be [T.S.] on FaceBook and messaged her in November 2016, asking for [T.S.] to contact CASA. [T.S.] did not respond. In the days leading up to the fact-finding trial, CASA called [T.S.] again on April 20, 2018, using the same number she used in November 2016. [T.S.] returned this call.

49. [T.S.] testified that she had been contacting the Delaware County Department of Child Services rather than Grant County DCS. Father and [T.S.] correspond via letters, and [T.S.] has visited Father a few times during his incarceration. Father never asked [T.S.] to contact Grant County DCS, never gave her any specific information about the CHINS case, and did not tell [T.S.] that the Court had ordered her to contact Grant County DCS. [T.S.] denies receiving any messages from CASA prior to April 20, 2018. [T.S.] acknowledges that she has a FaceBook page under the name "[T.M.]" and that she has had the same phone number since 2000; this is the phone number used by CASA in 2016.

50. The Court finds CASA's testimony to be credible regarding her attempts to contact [T.S.], and does not find [T.S.]'s testimony on this point credible.

51. [T.S.] is willing to become a licensed foster parent for [Child]. However, [T.S.] very clearly stated that she would not allow Father to have contact with [Child] or any of her other children after his release from incarceration due to his sexual misconduct convictions. [T.S.] has strong views on Father's crimes, and stated, "If it was my daughter, he wouldn't be standing there."

52. The Court observed [T.S.] very closely during her testimony. [T.S.] appeared not to particularly like Father. [T.S.] was also very hesitant when discussing the possibility of taking custody of [Child]. [T.S.] paused when asked about this possibility, and stated, "I'm looking in the best interest of the little girl . . . if I would, I could . . . I could try to re-establish a relationship with her." [T.S.] has not seen [Child] since [Child] was two or three years old. The tenor and implication of this halting and hesitant answer, in the observation of the Court, was that [T.S.] was not convinced that change of placement for [Child] away from Foster Mother and her siblings would be in [Child]'s best interest. [T.S.] did later state that she would adopt [Child], if permitted.

53. To remove [Child] and place her with [T.S.] would be to remove her from her siblings, with whom she has always lived, to a home that is essentially that of a stranger to [Child]. Further, [T.S.] has been clear that she will not allow Father to have contact with [Child]. So placing [Child] with [T.S.] will not maintain the parental relationship.

54. The conditions that led to [Child]'s removal have not been remedied since her removal on May 1, 2015. [Child] has remained outside her parents' care continuously since that time. The reasons for placement outside the home continue, and are not likely to be remedied.

55. DCS recommends termination of parental rights and adoption of [Child]. FCM Brubaker has been assigned to this case since November 2016. She has observed that [Child] has a strong bond with Foster Mother and her siblings. FCM Brubaker believes termination and adoption is in [Child]'s best interest.

56. CASA Crystal Foreman has represented [Child] and her siblings since May 24, 2016, and has had regular contact with the children since that time. CASA has had the opportunity to observe [Child]'s current living conditions and bond with placement on many occasions, more than once per month, at Foster Mother's home as well as at community events. [Child] is flourishing in her current home. Foster Mother and [Child] have a close connection, are affectionate to each other, and love each other. [Child] shares a bedroom with her sister. All siblings are very close. [Child] has never mentioned Father to CASA. CASA believes that termination and adoption are in [Child]'s best interests, and that it would be detrimental to [Child] to remove her from her siblings—with whom she has always lived—and the home where she has lived for nearly two years.

57. Mother has consented to the adoption of [Child] and her siblings by Foster Mother.

58. The Court finds that termination of parental rights is in [Child]'s best interest.

59. The Court finds that continuation of the parent-child relationship between [Child] and Father poses a threat to [Child]'s well-being.

60. The Court further finds that DCS's plan of adoption is more than satisfactory. Adoption would allow [Child] to remain with her siblings, and for the family unit that has developed and solidified over the last two years to remain intact.

CONCLUSIONS

* * *

Father cites *Rowlett v. Vanderburgh County OFC*, 841 N.E.2d 615 (2006) in support of his position that the Court should give him further time to reunify with [Child]. In *Rowlett*, the Indiana Court of Appeals reversed termination of parental rights where the father had availed himself of thousands of hours of programming while incarcerated, had an established relationship with his child prior to his incarceration, had demonstrated a commitment to maintaining a positive relationship with his child during incarceration, had shown improved insight regarding the criminal offenses for which he was incarcerated, was due to be released from incarceration within six weeks after the fact-finding hearing, had a plan for stability following release, and the child was placed with father's relatives who were supportive of father's relationship with the child.

This case is distinguishable from *Rowlett* in nearly every respect. First, Father has never had a relationship with [Child], and has never initiated a case to establish legal paternity of [Child]. Father sent only one letter for [Child] throughout the three-year CHINS proceeding. Second, despite the multitude of programs available to inmates at the DOC, Father has completed no programming while incarcerated for the past eight years. Third, unlike Rowlett, Father is incarcerated for sexual offenses involving a fifteen-year-old girl. Fourth, unlike Rowlett, Father has demonstrated no insight into his criminal offenses. In fact, Father claims that he lied under oath to establish the factual basis for his sex crimes. Father's minimization of his sex crimes, in conjunction with his sexually violent predator status, are of particular concern to the Court when it considers [Child]'s best interests. Fifth, Father's earliest possible release date is more than two years after the date of the fact-finding trial. Father will then be on probation for five years following his release. Sixth, [Child] is placed in foster care, not with relatives. The only

possibility of a relative placement, [Child]'s paternal aunt, never contacted Grant County DCS to seek custody, did not respond to CASA's messages until days before the second day of the termination trial, is wishy-washy regarding taking custody of [Child], and clearly states she would not allow Father to have contact with [Child] due to his sex crimes. Seventh, [Child] is currently placed with her siblings in a pre-adoptive foster home. To give Father additional time would be to force [Child] to wait for permanency for at least another two years—very likely more—and potentially separate her from her siblings. In short, *Rowlett* does not favor Father's position in this case.

[Child] is in need of, and deserves, stability and permanency in her life. Long-term foster care, even in an excellent home, cannot provide such permanency. [Child] is entitled to permanency and her needs are paramount. . . . [Child]'s involvement in the system began in May 2015. Children cannot wait indefinitely for their parents to work toward preservation and reunification. *In re E.M.*, 4 N.E.3d 636, 649 (Ind. 2014). [Child] has waited for three years for her parents to make progress, and she should not be expected to wait any longer.

Based upon the above and foregoing, the Court concludes that DCS has met its burden of proof, proving its petition to terminate Father's rights by clear and convincing evidence, to wit:

1. The child was removed from the home and custody of the parents, has been under the supervision of DCS for at least fifteen (15) of the most recent twenty-two (22) months, and has been removed from the parents for more than six (6) months pursuant to the terms of the dispositional decree.

2. There is a reasonable probability that:

> a. The conditions which resulted in the child's removal and continued placement outside the home will not be remedied; and

> b. Continuation of the parent-child relationship poses a threat to the child's wellbeing.

> 3. Termination of parental rights is in the child's best interests.

> 4. There is a satisfactory plan for the care and treatment of the child, that being adoption.

Appellant's App. Vol. II at 122-132. Thus, the court terminated Father's parental rights as to Child. This appeal ensued.

## Discussion and Decision

We begin our review of this issue by acknowledging that "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *Bailey v. Tippecanoe Div. of Fam. & Child. (In re M.B.)*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. *Schultz v. Porter Cty. Off. of Fam. & Child. (In re K.S.)*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.* Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.* at 836.

Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove:

> (B) that one (1) of the following is true:
>
> > (i)  There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii)  There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> > \* \* \*
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2) (2018).  DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'"  *R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.)*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses.  *Peterson v. Marion Cty. Off. of Fam. & Child. (In re D.D.)*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*.  Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment.  *Id.*  Moreover, in deference to the trial

court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Judy S. v. Noble Cty. Off. of Fam. & Child. (In re L.S.)*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[8] Here, in terminating Father's parental rights, the trial court entered specific findings of fact and conclusions thereon. When a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review. *Bester v. Lake Cty. Off. of Fam. & Child.*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

[9] On appeal, Father contends that the trial court erred when it concluded that: (1) the conditions that resulted in Child's removal and the reasons for her placement outside of his home will not be remedied; and (2) there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of Child.[2] Because the statute is written in the

---

[2] To the extent Father purports to challenge the trial court's conclusion that termination of his parental rights is in Child's best interests, he does not present cogent argument in support of that contention, and it is waived. Father does not challenge the trial court's conclusion that there is a satisfactory plan for the care and treatment of Child.

disjunctive, we need not address the court's conclusion that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to Child's well-being. I.C. § 31-35-2-4(b)(ii).

[10] Father maintains that "the conditions justifying [Child]'s removal had little to do with [Father], in that he was already incarcerated at the time the initial CHINS petition was filed." Appellant's Br. at 15. He acknowledges that Child's "continued placement in foster care is directly related" to his incarceration, but he "contends that this problem will be remedied by his release to probation" in June 2020. *Id.* Father's argument misses the mark.

[11] This court has clarified that, given the wording of the statute, it is not just the basis for the initial removal of the child that may be considered for purposes of determining whether a parent's rights should be terminated, but also any basis resulting in the continued placement outside of a parent's home. *Inkenhaus v. Vanderburgh Cty. Off. of Fam. & Child. (In re A.I.)*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. Here, the trial court properly considered the conditions leading to the continued placement outside of Father's home rather than simply focusing on the basis for the initial removal of Child. Father does not challenge the trial court's findings underlying its conclusion on this issue.

[12] And the evidence supports the trial court's findings and conclusion. To determine whether there is a reasonable probability that the reasons for Child's continued placement outside of Father's home will not be remedied, the trial court should judge Father's fitness to care for Child at the time of the

termination hearing, taking into consideration evidence of changed conditions. *See E.M. v. Ind. Dep't of Child Servs. (In re E.M.)*, 4 N.E.3d 636, 643 (Ind. 2014). However, the court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Moore v. Jasper Cty. Dep't of Child Servs.*, 894 N.E.2d 218, 226 (Ind. Ct. App. 2008) (quotations and citations omitted). Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* Moreover, DCS is not required to rule out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *Id.*

[13] The trial court found, and the evidence supports, that: Father has never met Child, who was seven years old at the time of the termination hearing, nor has he ever spoken with Child by telephone; Father attempted to communicate with Child on one occasion during the CHINS proceedings, when he sent her a card via DCS; "despite the multitude of programs available to inmates at the DOC, Father has completed *no* programming while incarcerated for the past *eight years*"; and "[t]o give Father additional time" to establish custody of Child after his release from incarceration in June 2020 "would be to force [Child] to wait for permanency for *at least* another two years [from the time of the termination hearing]—very likely more—and potentially separate her from her siblings." Appellant's App. Vol. II at 131 (emphases original).

Father's argument on appeal is simply an invitation for this Court to reweigh the evidence and judge the credibility of the witnesses, which we cannot do. Based on the totality of the circumstances, including Father's complete absence from Child's life since her birth more than eight years ago and his refusal to participate in any services towards demonstrating his ability to someday be a parent to Child, we hold that the trial court's findings support its conclusion that the conditions that resulted in Child's removal and the reasons for her placement outside of his home will not be remedied.

Affirmed.

Pyle, J., and Altice, J., concur.